**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

VIPIN KRISHNA CHENGARI and
KALYAN KRISHNA CHENGARI,

                Plaintiffs,

      v.

BANYAN CAY RESORT FUND, LLC,
BANYAN CAY RESORT FUND
MANAGEMENT, LLC, AMERICAN
IMMIGRATION GROUP, LLC, DAVID
FINKELSTEIN, and JACQUELINE
FINKELSTEIN-LEBOW,

                Defendants.

Civil Action No.

## COMPLAINT

      Plaintiffs, Vipin Krishna Chengari ("Vipin Chengari") and Kalyan Krishna Chengari ("Kalyan Chengari") (collectively, "Plaintiffs"), by and through their attorneys, Dickie, McCamey & Chilcote, P.C., file this Complaint and allege as follows:

### Parties

      1.    Plaintiff, Vipin Chengari, is an adult individual residing in the State of Arkansas. Since November 9, 2018, Vipin Chengari has been a Series A member of Defendant Banyan Cay Resort Fund, LLC.

      2.    Plaintiff, Kalyan Chengari, is an adult individual residing in the State of Arkansas. Since February 8, 2019, Kalyan Chengari has been a Series A member of Defendant Banyan Cay Resort Fund, LLC.

      3.    Defendant, Banyan Cay Resort Fund, LLC (the "Company"), is a Florida limited liability company with a registered address located at 1298 Park Street, Atlantic Beach, New York

11509. At all times relevant hereto, the Company was doing business in Palm Beach County, Florida.

4.      Defendant, Banyan Cay Resort Fund Management, LLC (the "Company Manager"), is a Florida limited liability company with a registered address located at 1298 Park Street, Atlantic Beach, New York 11509. At all times relevant hereto, the Company Manager was doing business in Palm Beach County, Florida.

5.      Defendant, American Immigration Group, LLC ("AIG"), is a Florida limited liability company with a registered address located at 1298 Park Street, Atlantic Beach, New York 11509. At all times relevant hereto, AIG was doing business in Palm Beach County, Florida.

6.      Upon information and belief, Defendant, David Finkelstein ("Finkelstein"), is an adult individual residing in the State of New York. Finkelstein is one of the founders, owners, and managers of AIG, as well as the sole member of Company Manager. At all times relevant hereto, Finkelstein has been responsible for controlling the day-to-day management and general business affairs of AIG, Company Manager, and Company. At all times relevant hereto, Finkelstein was doing business in Palm Beach County, Florida.

7.      Upon information and belief, Defendant, Jacqueline Finkelstein-Lebow ("Finkelstein-Lebow"), is an adult individual residing in the State of New York. Finkelstein-Lebow is one of the founders, owners, and managers of AIG. At all times relevant hereto, Finkelstein-Lebow, along with Finkelstein, has been responsible for controlling the day-to-day management and general business affairs of AIG, Company Manager, and Company. At all times relevant hereto, Finkelstein-Lebow was doing business in Palm Beach County, Florida.

8.      Finkelstein and Finkelstein-Lebow are collectively referred to herein, as appropriate, as the "Controlling Individuals."

**Jurisdiction and Venue**

9.      This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Securities Exchange Act (the "Exchange Act") (15 U.S.C. § 78aa) as the claims for violations of the Exchange Act asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

10.     This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367.

11.     Further, Section 11.17 of the Company's Operating Agreement (the "Operating Agreement") provides that: "…each of the parties irrevocably and unconditionally (a) agrees that any suit, action or legal proceeding arising out of relating to this Agreement shall be brought in the federal or state courts seated in Palm Beach County, Florida; (b) consents to the jurisdiction of such court in any such suit, action or proceeding; and (c) waives any objection which it may have to the laying of venue of any such suit, action or proceeding in such court."[1]

12.     Further, Section 11.8 of the Company's Subscription Agreement (the "Subscription Agreement") provides that: "Each party hereby irrevocably and unconditionally consents and submits to the exclusive jurisdiction of the courts of the State of Florida sitting in Palm Beach County and of the United States District Court for Southern District of Florida for any actions, suits or proceedings arising out of or relating to this Agreement[.]"

---

[1] The Operating Agreement, the Subscription Agreement (first referenced in ¶ 12), and the Memorandum (first referenced in ¶ 21) all contain confidentiality provisions. With respect to the confidentiality provisions, and out of an abundance of caution, Plaintiffs have not attached these documents as exhibits to their Complaint. The relevant terms, or excerpts, of each document are quoted or paraphrased herein as necessary. Plaintiffs will move to file these documents under seal if and when necessary. Plaintiffs further note that these documents originated from Defendants and Defendants have, or should have, copies in their possession.

13.     Venue is proper in this Court because, among other things, the parties stipulated and consented to jurisdiction in this forum in both the Operating Agreement and the Subscription Agreement.

**Facts**

a.     **Background of AIG, the Company, and the Project**

14.     In 2015, AIG, Finkelstein, and Finkelstein-Lebow formed the Company to make investments through the EB-5 Program of the United States Immigration and Nationality Act (the "Act").

15.     On its website, AIG touts itself as a "team of passionate people that endeavor to help families start a new life in the USA, this is a team of honest, professional, highly trained, and experienced members who are committed to making sure each investor is treated as family from day one, and that their investment will be successful both on immigration and financial aspects."

16.     On its website, AIG lists several successful EB-5 projects purportedly led by AIG. Notably, however, many of the projects identified on AIG's website pre-date AIG's existence.

17.     On its website, Finkelstein is identified as "one of the leading architects of the EB-5 industry" who has been "involved in real estate projects consisting of over $700 Million of EB-5 funding."

18.     Despite her role as a founder and owner of AIG, Finkelstein-Lebow is not identified on AIG's website. Upon information and belief, Finkelstein-Lebow has no relevant experience in the EB-5 industry.

19.     The EB-5 Program is a U.S. government program designed specifically to serve foreign nationals seeking to become eligible to obtain lawful permanent residence in the United States by making a qualifying investment through a "regional center," as that term is defined at 8

CFR 204.6(e), approved under the Immigrant Investor Pilot Program, as provided at 8 CFR 204.6(m).

20.     To satisfy the requirements of the Act, all investments made by the Company must be in one or more qualifying capital investment projects anticipated to create the required number of jobs in a "Targeted Employment Area," defined under the Act, as part of a regional center.

21.     Pursuant to the Company's Confidential Offering Memorandum, dated December 16, 2016, as revised February 28, 2017 (the "Memorandum"), that was provided to potential investors, including Plaintiffs, the Company's intended use of investor funds was as follows:

> The Company intends to use the proceeds of the Offering to make a secured loan (the "Loan") jointly to Banyan Cay Dev, LLC, a Florida limited liability company ("BCD"), and its affiliate Banyan Cay Resort & Golf, LLC, a Florida limited liability company ("BCRG" and together with BCD, the "Developers"). BCD was established to acquire President Country Club, an approximately 250-acre (101 hectare) master planned golf resort in West Palm Beach, Florida.

*See Memorandum*, p. iii.

22.     The Loan to the Developers was intended to fund a multi-faceted project (the "Project") which included the sale of residential lots, the development of condominiums, the renovation of a golf course, and the construction of a club house and grill room, a 4-court tennis center, and a hotel and resort. *See Memorandum*, pp. iii-iv.

23.     The Company sought, and obtained, investments solely from EB-5 Investors, like Plaintiffs.

24.     EB-5 Investors in the Company are identified as "Series A Members."

25.     Upon information and belief, the Company has twelve (12) Series A Members, each of whom invested $500,000, exclusive of fees, resulting in a $6,000,000 loan to the Developers.

26.     Upon information and belief, the Company originally sought a total investment of $60 million from 120 investors.

27.     As required under the EB-5 Program, the Loan by the Company was to be provided to the business(es) most closely responsible for job creation in connection with the Project.

28.     As set forth in the Memorandum, the Company was under the exclusive control of the Company Manager: "The Managing Member [Company Manager] controls the Company. The Managing Member is in turn under the joint control of David Finkelstein and Jacqueline Finkelstein-Lebow. Mr. Finkelstein and Ms. Finkelstein-Lebow are the founders and owners of American Immigration Group, LLC (together with its affiliates, "American Immigration Group"), a firm that provides advisory and management services to projects seeks to raise funds through the EB-5 Program." *See Memorandum*, p. iv.

29.     The Memorandum further provides: "Under Florida law, the Managing Member has fiduciary duties of care and loyalty to the Company and its Members. The duty of care requires the Managing Member to make informed decisions and consider carefully all available information before arriving at a decision. The duty of loyalty requires the Managing Member to act in good faith and in the best interests of the Company, and to put the Company's interests above the personal interests of the Managing Member or its owners." *See Memorandum*, p. 51

**b.     Plaintiffs' Membership in the Company**

30.     Vipin Chengari and Kalyan Chengari are brothers and citizens of India.

31.     Vipin Chengari resides in the State of Arkansas on an H1-B Visa.

32.     Kalyan Chengari resides in the State of Arkansas on an H-4 Visa.

33.     In or before 2018, Plaintiffs began exploring options to gain permanent residency in the United States, including through the EB-5 Program.

34.     Plaintiffs were introduced to the Company through an immigration attorney.

35.     Based upon their review of the Memorandum, and the representations included therein, and upon their review of AIG's website that touts AIG's experience in the EB-5 industry, Plaintiffs elected to invest in the Company as part of the EB-5 Program.

36.     Plaintiffs relied upon Defendants' purported experience and knowledge of the EB-5 industry in electing to invest in the Company.

37.     On November 9, 2018, Vipin Chengari executed the Company's Operating Agreement and Subscription Agreement. *True and correct copies of Vipin Chengari's signature pages are attached hereto, collectively, as Exhibit A.*

38.     On or about December 3, 2018, Vipin Chengari invested a total of $550,000, which included the minimum investment of $500,000 (the "Subscription Amount") required by the Company and the EB-5 Program, as well as a $50,000 administrative fee.

39.     On February 8, 2019, Kalyan Chengari executed the Company's Operating Agreement and Subscription Agreement. *True and correct copies of Kalyan Chengari's signature pages are attached hereto, collectively, as Exhibit B.*

40.     On or about February 14, 2019, Kalyan Chengari invested a total of $550,000, which included the minimum investment of $500,000 required by the Company and the EB-5 Program, as well as a $50,000 administrative fee.

41.     On December 7, 2018, Vipin Chengari filed his Immigrant Petition by Alien Investor ("I-526 Petition") with the U.S. Citizen and Immigration Services ("USCIS"). A Form I-526, if granted by the USCIS, allows an EB-5 Investor to obtain conditional lawful permanent resident status for a period of two years.

42.     On February 15, 2019, Kalyan Chengari filed his I-526 Petition with the USCIS.

### c.      Relevant Terms of the Operating Agreement and Subscription Agreement

43.     The Company was required to apply Plaintiffs' Subscription Amounts to the Loan to the Developers. The Developers, in turn, were required to apply the Loan toward one or more qualifying capital investment projects anticipated to create the required number of jobs in a Targeted Employment Area under the EB-5 Program.

44.     Per the Memorandum, the Company was required to establish a Reserve Account:

> The Company will establish the Reserve Account with the Escrow Agent and, prior to initial release of Subscription Amounts from the Escrow Account, will cause the Developers to deposit $1.5 million into the Reserve Account. The Developers are required to maintain a $1.5 million minimum balance in the Reserve Account. The Escrow Agent will release funds from the Reserve Account to enable the Company to return the Subscription Amount or Administrative Fee of any subscriber who becomes entitled to return after his or her Subscription Amount or Administrative Fee has been released from the Escrow Account.

*See Memorandum*, p. 7.

45.     Pursuant to Section 2.7 of the Operating Agreement, the Company is obligated to return a Series A Member's Subscription Amount as follows:

> 2.7     <u>Return of Capital</u>. Without the prior written consent of the Managing Member, the Company will be obligated to return a Series A Member's Subscription Amount prior to repayment of the Loan only in accordance with this <u>Section 2.7</u>.
>
> 2.7.1   If USCIS denies a Series A Member's I-526 Petition, and all administrative rights of appeal have been exhausted or waived, or if such Series A Member voluntarily withdraws his or her I-526 Petition prior to USCIS adjudication, then, in either such case, the Series A Member shall provide notice thereof to the Company, which notice shall include copies of all USCIS correspondence relating to such I-526 Petition. Thereafter, the Company shall take the following steps in the following order to facilitate a return of such Series A Member's Subscription Amount:
>
> 2.7.1.1 If any funds become available for release as a result of such denial or withdrawal under any reserve account established for such purpose by the Company and funded by the Developers, cause such funds to be released in accordance with such escrow agreement;

2.7.1.2 Use commercially reasonable efforts to replace the Series A Member with a substitute subscriber and return the Series A Member's Subscription Amount within 90 days after the Company received notice of denial or withdrawal from the Series A Member's I-526 Petition; and

2.7.1.3 Within 180 days after the Company received notice of denial or withdrawal from the Series A Member's I-526 Petition, cause the Developers to make a mandatory prepayment of Loan principal to enable the Company to return the Series A Member's Subscription Amount under the terms of a guarantee provided by the Developers to the Company set forth in the Loan Agreement, to the extent the proceeds of the Series A Member's Subscription Amount constitute Loan Funds;…

46.    Section 2.8.1 of the Operating Agreement further provides that "[t]he Company will return a Series A Member's Administrative Fee if USCIS denies the Series A Member's I-526 Petition, and all administrative rights of appeal have been exhausted or waived, due to a failure of the Company or the Project to comply with EB-5 Program requirements."

### d.    The Project is Distressed

47.    The Memorandum provided for the following project timeline: "Preparatory and demolition work commenced in 2015 along with golf course redevelopment. Construction of the Resort Project is expected to commence in February 2017, with a projected completion date 20 months later, in September 2018. Construction of the Residential project is expected to commence in May 2017, with a projected completion date 38 months later, in July 2020." *See Memorandum*, p. iv.

48.    Already well behind schedule, the Project encountered significant problems in or around April 2021, when the U.S. Department of Justice filed a complaint against Domenic Gatto ("Gatto"), the controlling individual of Developers, for his role in a $65 million nationwide conspiracy to defraud federal healthcare programs. Specifically, Gatto was charged with one count of conspiracy to commit healthcare fraud, in connection with soliciting and receiving healthcare kickbacks.

49.     According to Company's August 4, 2022 Notice to Investors, signed by Finkelstein on behalf of Company Manager, on July 23, 2021, Gatto resigned as the manager of the Developers and his sister became the new manager. According to the Notice "[d]espite his personal assurances to the contrary, Mr. Gatto has continued to participate actively in the day-to-day management of the Developer and the Project."

50.     On November 19, 2021, the DOJ announced an 11-count indictment against Gatto alleging conspiracy to commit wire fraud, conspiracy to commit healthcare fraud, healthcare fraud, conspiracy to transact in criminal proceeds, transacting in criminal proceeds, and conspiracy to violate the federal Anti-Kickback Statute.

51.     Upon information and belief, the Project's senior lender, U.S. Real Estate Credit Holdings III-A L.P. (the "Senior Lender"), issued multiple notices of default to the Developers culminating in Senior Lender filing a foreclosure action against the Developers in July 2022.

52.     Upon information and belief, facing mounting financial difficulties exacerbated by Gatto's criminal problems, the Developers decided to sell their assets, rather than complete the Project.

53.     Upon information and belief, on September 16, 2022, the Developers entered into a purchase and sale agreement (the "PSA") with 2020 Banyan LLC to sell almost all of their respective real property.

54.     Upon information and belief, despite the PSA, on or about December 16, 2022, the Company Manager, AIG, and the Controlling Individuals caused the Company to commence a UCC foreclosure sale of the equity pledged by Banyan Cay Mezzanine Borrower, LLC (the "Mezzanine Borrower"), the direct legal and beneficial owner of 100% of the issued and

outstanding limited liability company interests in each of the Developers, on account of the Loan, which was scheduled for February 17, 2023 (the "UCC Sale").

55.     Upon information and belief, the PSA was re-negotiated in mid-January 2023 and, on February 13, 2023, the Developers and an affiliate of 2020 Banyan LLC entered into a second amendment to the PSA, with a purchase price of $113 million. Upon information and belief, under this re-negotiated price, the Company and, in turn, the Series A Members, would have received a substantial recovery of the Loan.

56.     However, upon information and belief, on or around February 15, 2023, Defendants informed the Developers and Mezzanine Borrower that the deal contemplated under the PSA was unacceptable and it would refuse to adjourn the scheduled UCC Sale.

57.     Upon information and belief, the Controlling Individuals, acting in their own best interests and not that of the Company's, opposed the transaction contemplated by the PSA because it would not cover over $1 million in fees and interest that inured solely to their benefit.

58.     Upon information and belief, Defendants' block of the transaction contemplated by the PSA, Defendants' insistence on proceeding with the UCC Sale, and Senior Lender obtaining a judgment against in the Developers in its foreclosure action, forced the Mezzanine Borrower and Developers to declare bankruptcy.

59.     Specifically, on February 16, 2023, Mezzanine Borrower filed for a Chapter 11 bankruptcy, later converted to a Chapter 7 bankruptcy, in the United States Bankruptcy Court for the Southern District of Florida.

60.     Thereafter, on March 29, 2023, the Developers, and other affiliated entities, filed for Chapter 11 bankruptcies, later converted to Chapter 7 bankruptcies, in the United States Bankruptcy Court for the Southern District of Florida.

61.     On September 11, 2023, the Company issued a Notice to Investors, signed by Finkelstein on behalf of Company Manager, advising that the Senior Lender had acquired title to the Project through a "credit bid" of $96.5 million. This was $16.5 million less than the sale contemplated under the PSA, as re-negotiated.

62.     In the September 11, 2023 Notice, Series A Members were informed that they would not receive any repayment of their investment through the Senior Lender's acquisition of the Project.

63.     Upon information and belief, the Company initiated separate lawsuits against the Senior Lender for violating the Company and Senior Lender's Intercreditor Agreement and against Gatto for violating the terms of the Loan.

64.     On November 27, 2023, the Company issued a Notice to Investors, signed by Finkelstein on behalf of Company Manager, advising that the Company was in settlement negotiations with Senior Lender but that "any recovery of the investments made by the Company's Series A Members is unlikely." Regarding the Company's lawsuit against Gatto, the Notice provided that "[g]iven the numerous other cases filed against Gatto, the lack of any meaningful assets in comparison to his staggering debts, and the subordination of any recovery by the Company to litigation filed by the Senior Lender against Gatto pursuant to the Intercreditor Agreement, the Company has been advised by its outside counsel that the potential of a recovery would not justify the cost and expense of protracted litigation."

65.     Upon information and belief, the Company settled its action against Senior Lender in late 2023. The Series A Members received nothing from the proceeds of the Company's settlement with the Senior Lender.

e.      **Plaintiffs' I-526 Petitions are Denied**

66.     By August 2022, and likely sooner, Defendants were aware that Series A Members'
I-526 Petitions were in jeopardy.

67.     Specifically, in its August 4, 2022 Notice to Investors, the Company stated that in
June 2021, USCIS issued a Request for Evidence ("RFE") in connection with a Series A Member's
I-526 Petition referencing, among other things, the federal complaint against Gatto.

68.     The Company further stated that in May 2022, USCIS issued a Notice of Intent to
Deny ("NOID") a Series A Member's I-526 Petition asserting that the Project was no longer
feasible due to Gatto's indictment.

69.     Further still, the Company stated that as of August 4, 2022, USCIS had issued two
NOIDs to Series A Members and two Notices of Intent to Revoke previous Series A Member's I-
526 Petition approvals. In total, the Notice indicates that USCIS was investigating, challenging, or
revoking the I-526 Petitions of five Series A Members – over 40% of the total number of Series A
Members.

70.     On November 10, 2022, USCIS issued a denial of Vipin Chengari's I-526 Petition.

71.     USCIS's denial provides that "[t]he evidence of record fails to establish that the
required minimum amount of capital has been made available to the businesses most closely
responsible for job creation." The denial provided the following details:

> Specifically, as previously mentioned, the Subscription and Administrative Fee
> Escrow Agreement, effective date, February 27, 2017, had specific release
> conditions which included making EB-5 funds available to Banyan Cay Dev, LLC
> and Banyan Cay Resort & Golf, LLC, the initial job creating entities. Now, the
> evidence in the record indicates that the plan is for the [Company] to loan EB-5
> funds to Banyan Cay Mezzanine Borrower, LLC, which would then make these
> EB-5 funds available to "fund approved Project costs, through capital contributions
> to wholly owned subsidiaries that, in turn, own individual Project components."

However, it appears based on the information Petitioner provided through counsel[2] that on October 15, 2020, the EB-5 funds were not loaned to Banyan Cay Mezzanine Borrower, LLC…Instead, the EB-5 funds were purportedly loaned to the EB-5 project when they were sent to Cherry Edgar Smith PA Iota Trust as asserted by counsel for Petitioner.

USCIS notes, there is no evidence that paying the Cherry Edgar Smith PA Iota Trust $5 million in EB-5 funds is equivalent to a loan to Banyan Cay Mezzanine Borrower, LLC. A review of the EB-5 loan agreement, dated October 15, 2020, does not describe or indicate a payment of the EB-5 funds to Cherry Edgar Smith PA Iota Trust to pay off the construction liens or that payment of the construction liens was from EB-5 funds lent to Banyan Cay Borrower, LLC…In addition, Petitioner asserts through counsel, that paying off the construction liens on October 15, 2020, was part of the senior loan modification; however, there is no documentary evidence in the EB-5 loan agreement, dated October 15, 2020, concerning paying off the construction liens with EB-5 funds. Additionally, the record does not have any documentary evidence that the construction liens were part of the "approved project costs" as described in the Confidential Private Offering Memorandum, Supplement #2, dated October 2, 2020, p. 2.

*A true and correct copy of USCIS' Decision on Vipin Chengari's I-526 Petition is attached hereto as Exhibit C.*

72.     In short, Vipin Chengari's I-526 Petition was denied because Defendants misapplied his Subscription Amount by failing to ensure it was made available to the business(es) most closely responsible for job creation as required by the EB-5 Program.

73.     Instead, Defendants allowed the Loan, made up entirely of the Series A Members' Subscription Amounts, to be transferred to the Iota trust account of the law firm of Cherry Edgar Smith PA to pay off construction liens.

74.     On January 20, 2024, Kalyan Chengari's I-526 Petition was denied by USCIS for the same reasons set forth in Vipin Chengari's denial. *A true and correct copy of USCIS' Decision on Kalyan Chengari's I-526 Petition is attached hereto as Exhibit D.*

---

[2] The information supplied by Plaintiffs, through counsel, to USCIS was provided by Defendants to Plaintiffs and their immigration counsel.

75.     Defendants' misapplication of Vipin and Kalyan Chengari's Subscription Amount was in direct contravention of Defendants' representations in the Memorandum, Operating Agreement, and Subscription Agreement, and in violation of USCIS requirements.

76.     Defendants, led by Finkelstein, who touts himself as "one of the leading architects of the EB-5 industry," knew, or should have known, that the failure to ensure that Vipin and Kalyan Chengari's Subscription Amounts were made available to the business(es) most closely responsible for job would result in the denial of their I-526 Petitions.

77.     Both Vipin and Kalyan Chengari have waived their right to challenge or appeal USCIS's denial of their respective I-526 Petitions.

78.     The denial of Vipin and Kalyan Chengari's I-526 Petitions was through no fault of their own. Rather, the denials were solely "due to a failure of the Company or the Project to comply with EB-5 Program requirements."

79.     To date, and despite their contractual obligations, Defendants have failed and/or refused to return Vipin and Kalyan Chengari's respective Subscription Amounts and Administrative Fees.

80.     By and through this Complaint, Plaintiffs provide notice of USCIS's denial of their respective I-526 Petitions to Defendants and demand the immediate return of their respective Subscription Amounts and Administrative Fees.

81.     Upon information and belief, Defendants have failed and/or refused to return to the Subscription Amount and Administrative Fee of at least one other Series A Member, whose I-526 Petition was denied for the same reasons as Vipin and Krishna Chengari's I-526 Petitions. *See* Docket No. 24-cv-80103-DMM.

<u>COUNT I</u>
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
*Against all Defendants*

82.     Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint as if fully set forth herein at length.

83.     In connection with the offering for investment into the Company as part of the EB-5 Program, Defendants: (i) employed manipulative or deceptive devices, and (ii) knowingly made false statements of material facts and intentionally concealed material facts in the Memorandum and on the AIG website regarding Defendants' experience, acumen, and reputation, and about the risks involved in the Company's EB-5 investment, and intentionally omitted other material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, regarding their experience and reputation in the field of EB-5 financing, in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

84.     Plaintiffs relied upon these misrepresentations in purchasing Series A Memberships in the Company.

85.     Had Plaintiffs known the facts concealed or misrepresented, they would not have invested in the Company.

86.     At all times relevant hereto, Defendants knew that these misrepresentations and omissions were false or, in light of the circumstances under which they were made, misleading.

87.     Company Manager, AIG, and Controlling Individuals directly benefited from these misrepresentations including, without limitation, in the form of Plaintiffs' respective Administrative Fees.

88.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered damages in the form of their Subscription Amount and Administrative Fee. Further,

Plaintiffs' immigration prospects have been irreparably damaged by Defendants' wrongful conduct.

### COUNT II
### Violation of Section 20(a) of the Exchange Act
### *Against the Controlling Individuals*

89.     Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint as if fully set forth herein at length.

90.     In connection with the offering for investment into the Company as part of the EB-5 Program, the Company, through the Controlling Individuals: (i) employed manipulative or deceptive devices, and (ii) knowingly made false statements of material facts and intentionally concealed material facts in the Memorandum and on the AIG website regarding Defendants' experience, acumen, and reputation, and about the risks involved in the Company's EB-5 investment, and intentionally omitted other material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, regarding their experience and reputation in the field of EB-5 financing, in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

91.     The Controlling Individuals acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act.

92.     At all times relevant hereto, the Controlling Individuals had the power to control the general business affairs of the Company, and through their roles with AIG, had the power to control or influence the public statements made by AIG and the Company.

93.     By reason such conduct, the Controlling Individuals are liable pursuant to Section 20(a) of the Exchange Act.

**COUNT III**
**Fraudulent Inducement**
*Against all Defendants*

94.　　Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint as if fully set forth herein at length.

95.　　In connection with offering for investment into the Company as part of the EB-5 Program, Defendants intentionally made false statements of material fact, and omitted material facts, in the Memorandum and on AIG's website regarding Defendants' experience and reputation in the field of EB-5 financing and the safety of the Company's EB-5 Program investment.

96.　　Defendants knew of the falsity of the statements and intended for Plaintiffs and other potential subscribers would rely upon these statements to invest in the Company.

97.　　Plaintiffs relied on these misrepresentations and omissions in investing in the Company, trusting that Defendants would ensure that Plaintiffs' Subscription Amounts would be correctly applied in accordance with the requirements of the EB-5 Program and the terms of the Memorandum.

98.　　As a direct and proximate result of this wrongful conduct, Plaintiffs have suffered damages through the loss of their Subscription Amount and Administrative Fee.

99.　　Under Florida law, punitive damages are warranted for this intentional, fraudulent conduct.

**COUNT IV**
**Breach of Contract**
*Against the Company*

100.　　Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint as if fully set forth herein at length.

101.    The Company's Operating Agreement is a valid and enforceable contract between the Company and Vipin Chengari, and the Company and Kalyan Chengari.

102.    Pursuant to the Operating Agreement, following the denial of Plaintiffs' respective I-526 Petitions, and the waiver of the right to appeal same by Plaintiffs, the Company was obligated to return Plaintiffs' respective Subscription Amounts.

103.    Pursuant to the Operating Agreement, because the denial of Plaintiffs' respective I-526 Petitions was "due to a failure of the Company or the Project to comply with EB-5 Program requirements," the Company was obligated to return Plaintiffs' respective Administrative Fees.

104.    In breach of the Operating Agreement, the Company did not: (i) cause the Escrow Agent to release funds to the Company from the Reserve Account; (ii) use commercially reasonable efforts to replace the Series A Members (*i.e.*, Plaintiffs) with substitute subscribers and return Plaintiffs' Subscription Amounts within ninety days after notice of the denials of Plaintiffs' respective I-526 Petitions; and (iii) cause the Developers to make a mandatory prepayment of Loan principal under the Early Release Guaranty to enable the Company to return Plaintiffs' respective Subscription Amounts within one hundred eighty days after notice of the denials of Plaintiffs' respective I-526 Petitions.

105.    The Company has breached the Operating Agreement by failing and refusing to return Plaintiffs' respective Subscription Amounts and Administrative Fees.

106.    As a direct and proximate result of the Company's breach of the Operating Agreements, Plaintiffs have suffered damages in the amount of their unreturned Subscription Amounts and Administrative Fees, as well as pre-judgment interest.

<u>**COUNT V**</u>
**Breach of Fiduciary Duty**
*Against Company Manager, AIG, and the Controlling Individuals*

106.    Plaintiffs hereby incorporate the foregoing paragraphs of this Complaint as if fully set forth herein at length.

107.    As the managing member of the Company, the Company Manager, AIG, and the Controlling Individuals who, in turn, control the Company Manager, owe fiduciary duties to the Series A Members of the Company, including the duties of loyalty and care.

108.    The Company Manager, AIG, and the Controlling Individuals breached the duty of loyalty owed to the Series A Members, including Plaintiffs, in opposing the PSA, which would have allowed the members to recover some, or all, of their investment, for the sake of recouping their own fees.

109.    The Company Manager, AIG, and the Controlling Individuals took these actions with willful disregard to the rights of Plaintiffs and the other Series A Members of the Company.

110.    The Company Manager, AIG, and the Controlling Individuals breached the duty of care to the Series A Members, including Plaintiffs, by engaging in grossly negligent or reckless conduct, willful or intentional misconduct, or a knowing violation of law as it relates to the misapplication of Plaintiffs' Subscription Amounts.

110.    As a direct and proximate result of this breach of fiduciary duty, Plaintiffs have been damaged, in an amount to be proven at trial.

111.    Under Florida law, punitive damages are warranted for the aforementioned reckless, willful, intentional misconduct and/or knowing violation of the law.

WHEREFORE, Plaintiffs, Vipin Krishna Chengari and Kalyan Krishna Chengari, respectfully request that this Court award the following relief:

a.      Award Plaintiffs compensatory damages for Defendants' wrongful conduct, in an amount to be proven at trial, but no less than the total of Plaintiffs' respective Subscription Amounts and Administrative Fees;

b.      Assess punitive damages against Defendants and in favor of Plaintiffs; and

c.      Grant such other and further relief as the Court may deem just, equitable, and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial on all issues so triable.

Respectfully submitted,

DICKIE, McCAMEY & CHILCOTE, P.C.

_/s/ *Edwina V. Kessler*_____
Edwina V. Kessler, Esquire
FL I.D. # 016209

633 S. Andrews Avenue
Suite 300
Fort Lauderdale, FL 33301
Tele. No.: (954) 463-8593

Counsel for Plaintiffs

Dated: May 1, 2024